395 So.2d 442 (1981)
LOUIS DREYFUS CORPORATION
v.
CONTINENTAL GRAIN COMPANY.
No. 11392.
Court of Appeal of Louisiana, Fourth Circuit.
February 5, 1981.
Writ Refused April 27, 1981.
Monroe & Lemann, W. Malcolm Stevenson and Michael R. O'Keefe, III, New Orleans, for plaintiff-appellant.
Lemle, Kelleher, Kohlmeyer & Matthews, Charles Kohlmeyer, Jr., Alan H. Goodman, and Peter L. Koerber, New Orleans, for defendant-appellee.
*443 Before SAMUEL, BARRY and SARTAIN, JJ.
SAMUEL, Judge.
This proceeding arises out of the alleged breach by the defendant of its April 8, 1971 six year contract with the plaintiff. As will be seen below, the contract provided in part for defendant to load grain aboard ocean-going vessels for plaintiff for export at defendant's grain elevator located in Westwego, Louisiana. The alleged breach is represented to be a telex dated January 17, 1977 from defendant to plaintiff by which defendant cautioned plaintiff it could not guarantee availability in February, 1977 of suitable grain to load a vessel nominated by plaintiff because of ice jams in the upper Mississippi River and invoked the contract's force majeure clause.
Plaintiff previously had filed a suit for specific performance and damages, but the requested relief was denied on the ground that plaintiff had an adequate remedy at law.[1]
On remand, plaintiff amended its petition to seek damages of $1,735,000 for losses sustained by defendant's actions. Defendant answered, denied plaintiff's allegations, and reconvened for a declaration of impossibility of performance, damages for unpaid interest under the contract, and other matters not pertinent here. In due course, the pleadings were amended to raise the issue of plaintiff's liability to defendant for "elevation charges" pursuant to increases in defendant's grain handling tariffs.
After an extensive trial on the merits, judgment was rendered in favor of plaintiff and against defendant for $15,354.77, representing a finding of damages in favor of plaintiff for defendant's breach in the amount of $97,988.77, offset by interest due defendant by plaintiff in the amount of $82,634. Plaintiff has appealed from this judgment, and defendant has answered the appeal seeking reversal of the judgment in favor of Dreyfus and also seeking damages in addition to the $82,634 awarded it by way of setoff.[2]
Both plaintiff and defendant are dealers and exporters of grain and participate in national and international trade. Both are large corporations with a great deal of experience in the grain handling business. Both own grain elevators, and both are fully cognizant of the problems inherent in the gathering, purchase, delivery, loading, and export of grain. During the negotiation and confection of the contract in suit, as well as during the years of its execution, both companies were represented by able executives, employees, and legal counsel. Consequently, the record reflects no evidence of any error or mistake on the part of either party in the incidents leading to the present dispute.
In December, 1976 and January, 1977, the central portion of the United States experienced a severe winter. The Mississippi River froze between St. Louis, Missouri and Cairo, Illinois, bringing river traffic to a virtual standstill. This situation was made official by the closing of the river to navigation by the United States Coast Guard between January 14 and February 17, 1977.[3]
Simply stated, the contract between plaintiff and defendant on its face called for plaintiff to sell various quantities of grain in the form of corn or soybeans to defendant C.I.F. barge or rail Westwego.[4] Defendant then sold like quantities and qualities of grain back to plaintiff F.O.B. plaintiff's designated vessel at Westwego. Defendant charged plaintiff the exact price *444 it originally had paid plaintiff for the grain plus a charge per bushel for using its elevator to load the ships (elevation charge), and interest at the rate of 1% over the prime rate at First National City Bank in New York for a period between the payment by defendant to purchase the grain and the payment back to plaintiff to repurchase it.[5]
While the river was frozen, plaintiff took the necessary steps under the contract to sell 20 or 21 barges of grain to defendant in anticipation of exporting a like quantity from defendant's grain elevator at Westwego in February. When plaintiff made the sale, its executives and employees knew the barges containing the grain thus sold were icebound and could not reach New Orleans in the normal period of time.
In addition, the executives and employees of both companies knew sufficient quantities and qualities of grain to load the vessels to be nominated by plaintiff were available in the New Orleans area by rail or barge in the spot market.[6] However, both parties also knew that the relative scarcity of grain caused by the freezing of the river called for a spot market price of $0.30 over the future's contract price for March delivery grain of $7.45 per bushel.[7] Neither plaintiff nor defendant wanted to bear the burden of paying the $0.30 per bushel premium price in order to fulfill its obligations under the contract. Consequently, defendant sent the telex mentioned above warning of the potential impossibility of loading plaintiff's ship in February and invoking the force majeure clause in the contract. On January 18, representatives of plaintiff and defendant discussed the possibility of providing defendant with sufficient quantity of grain from other sources, but plaintiff chose not to take such action because it felt it was not obligated to do so under the contract.
Instead, plaintiff diverted the M/V Ogden Importer, originally scheduled to be loaded in February at the Westwego elevator, to a grain elevator in Mobile, Alabama. Plaintiff had already scheduled loading of the M/V World Ares for that period in Mobile, and the diversion of the Ogden Importer to take the place in line at the elevator of the World Ares in Mobile required diversion of the World Ares to a grain elevator in Baltimore, Maryland. The arrival of the World Ares in Baltimore likewise caused the diversion of plaintiff's M/V Lucy, which in turn displaced the M/V Stream Dolphin to another grain elevator, which in turn displaced the M/V Tete Oldendorff to another elevator, which in turn displaced the M/V Fadura to another elevator, which in turn displaced plaintiff's M/V Marco Verde to still another elevator. Plaintiff claims that each of these diversions resulted in delays, demurrage, extra stevedoring fees, cleaning fees, and a host of other items of damage for each displacement.
Both parties attempt to justify their respective positions and actions (and thus pass the loss for the price differential between icebound and free grain to the other) by characterizing the contract of April 8, 1971 in different ways. Plaintiff contends the 1971 agreement merely established the framework for a series of separate and independent purchase and sales transactions which are totally unrelated to each other. Based on this hypothesis it argues the purchase by defendant of icebound grain prior to the scheduled February F.O.B. shipment period in Westwego was totally unrelated to defendant's obligation to load vessels nominated by plaintiff for loading in February. Consequently, plaintiff argues defendant was obligated to procure the necessary grain from whatever source was available *445 in order to comply with its contract in February, and that defendant breached its contract by invoking the force majeure clause.
On the other hand, defendant argues the seemingly separate purchases and sales to and from each other were placed in the contract to ease the burden of grain handling, and the contract is in fact a document known in the grain business as a "through-put" contract. Defendant explains a "through-put" contract is an agreement in which the owner of grain intending to ship for export through a grain elevator delivers the quantity of grain to be exported, the elevator takes the grain from the delivering vehicle (whether barge or rail car), and loads it aboard an ocean-going vessel for a charge, known as an "elevation charge". Defendant argues that because grain is fungible and within certain limits and grades one quantity of grain can be substituted for another quantity, "through-put" agreements no longer are confected on an "identity preserved" basis in which the identical grain delivered by the exporter is loaded aboard the ocean-going vessel by the grain elevator with title remaining at all times in the seller-exporter. Identity preserved contracts are no longer in fashion because elevators handle different types of grain in different loading sequences, so that record keeping and demurrage charges are so burdensome it is impractical to preserve the identity of the grain, particularly in view of its fungible nature.
Defendant finally argues the most recent innovation in "through-put" agreements is the type now at issue, by which the exporter sells the grain to the elevator owner, and the elevator owner obligates itself to load equal amounts and qualities of grain aboard the vessels. This variation in contractual procedure allows the grain elevator operator more freedom in controlling the amount of grain which comes to his elevator at any given time by selling off various barges or rail cars of the fungible grain to other purchasers as it descends the river in order to avoid a glut of grain at any given time at the elevator. Such a glut, if it is in excess of the elevator's capacity, results in increased demurrage charges for using rail cars and barges as storage facilities and increases record keeping. Defendant argues, in effect, that passage of title to the elevator owner with the right to sell off quantities of grain in transit or after arrival merely assists both exporter and elevator operator in controlling the flow of grain to the elevator in an expeditious and economical way. The contract is thus not changed in basic character; it remains a "through-put" agreement, which presupposes the delivery of grain for export before the date of vessel loading, even though the identity of the grain loaded may be different from that of the grain actually shipped.
In his Reasons for Judgment the trial judge found the contract between the parties was not ambiguous and thus not subject to explanation by parol evidence. He concluded the contract on its face was one to purchase and sell grain and not a "through-put" agreement. Our examination of the contract leads us to a contrary conclusion, and we hold parol evidence was admissible to explain the nature of the contract.
The preamble to the contract contains the first ambiguity in need of explanation. It reads as follows:
"Continental operates a grain elevator at Westwego, Louisiana (the `Elevator') and Dreyfus desires to make use of such facility. The parties, in the interests of the most expeditious handling, desire to handle grain by way of purchases and sales between themselves and will establish customary grain contracts to suit transactions." (Emphasis ours).
The statement that plaintiff desires to make use of defendant's grain elevator belies the argument of a series of separate contracts to purchase and sell. On the contrary, a "through-put" agreement presupposes payment by an exporter for the use of the elevator in taking grain from land or water conveyances and putting it through the elevator to load aboard a vessel. And the words of explanation indicating the parties "desired to handle grain by way of *446 purchases and sales" may indicate the parties have chosen a special method by which plaintiff was given the opportunity to make use of the elevator.
The preamble seems to be a logical lead into Section 1 of the contract, termed "Coordination of Transactions." The final paragraph of this section provides as follows:
"1.1 Dreyfus will, from time to time, purchase from Continental hereunder grain for a 15 day shipping period FOB vessel (such shipping period hereafter called the `FOB Shipping Period'), and Dreyfus will sell to Continental like quantities (30,000 bushels more or less for each contract, any such excess or deficiency to be settled at market price on day of last tender), varieties and qualities of grain CIF or track Westwego, all as more fully set forth herein."
Sections 3.1 and 3.2 of the contract likewise lead us to conclude parole evidence is admissible:
"3.1 Price of Grain Sold by Dreyfus

a. Except for the requirement of settlement at the market as provided in subsection 1.1 hereof, the price to be paid by Continental for a shipment of grain sold hereunder by Dreyfus shall be the market price as agreed upon by the parties, and reduced by the discounts set forth in Subsections 2.2 and 3.1 b.
* * * * * *
3.2 Price of Grain Sold by Continental

a. Except for the requirement of settlement at the market as provided in subsection 5.2 hereof, the price for a shipment of grain sold by Continental hereunder shall be the aggregate of the contract prices per bushel of the CIF or delivered Westwego grain sold by Dreyfus to Continental for all quantities of grain purchased by Dreyfus up to the contract quantity, to which aggregate there shall be added the sum of:
(1) 2¼ cents per bushel for such quantities for in and out elevations;
(2) the charges for inbound inspection and weighing and for outbound inspection and weighing as per New Orleans Board of Trade rates for such quantities."
These provisions are significant in that they validly establish the price of grain to be sold by defendant to plaintiff F.O.B. plaintiff's nominated vessel. Defendant has no right under the terms of the contract to vary the price charged on the F.O.B. sale, even though the contract deals with commodities, the price of which fluctuates daily, and sometimes violently, on both the spot and futures markets. The abandonment of the right to sell at whatever the market will bear is inconsistent with a series of independent sale and purchase contracts. This ambiguity is further heightened by the provisions of Section 3.2 c:
"3.2 c. In addition to all sums paid under Subsections a and b of this Section 3.2, Dreyfus shall pay an interest charge of 1% over the prime rate of First National City Bank, New York, New York, on the amounts paid by Continental in the usual manner for grain purchased from Dreyfus for the period between such payments and the payments by Dreyfus in the usual manner for the corresponding grain sold by Continental to Dreyfus. The period between payments shall be computed from the date Dreyfus receives funds in payment for grain purchased by Continental to the date Continental receives funds in payment for grain purchased by Dreyfus."
This provision creates an ambiguity and undermines the concept of separate and independent purchase and sale contracts. It requires the payment of 1% over prime on the money used by defendant to make the original purchase of grain from plaintiff in anticipation of its loading for export. The operative word in the paragraph is "corresponding". By the terms of this provision, interest is computed on the time between defendant's purchase of grain from plaintiff and the payment by plaintiff to defendant "for the corresponding grain ...." The word "corresponding" clearly implies the parties anticipate loading F.O.B. in Westwego of, at a minimum, a like amount *447 of grain previously shipped by plaintiff. If the other situation were contemplated, so that the grain would be loaded prior to delivery of a corresponding amount of grain from plaintiff, then the clause would appear to be rendered meaningless and would have no place in the agreement.
Finally, appended to one of the copies of the contract in the record are several letter agreements extending the effective date for its commencement. One of these letter agreements is dated July 23, 1971 and was sent by Bernard Steinweg, senior vice president of Continental Grain Company, to William Louis Dreyfus, on behalf of Louis Dreyfus Corporation. The first paragraph of this letter reads as follows:
"This is to confirm our agreement regarding a two month extension to be afforded your company under the contract between us dated April 8, 1971, relating to the thruput of grain at Continental's Westwego elevator, as follows..." (Emphasis ours).
This document, which forms an addendum to and part of the contract of April 8, 1971, was approved in writing by an executive of Louis Dreyfus Corporation and leads us to the conclusion that the contract on its face is ambiguous and requires the introduction of parol evidence to explain its nature.
Fortunately, the trial judge referred all objections to admissibility of parol evidence explaining the nature of the contract "to the effect" and allowed the evidence to be taken subject to plaintiff's objection, a procedure which affords us the opportunity to decide the matter at this time without the necessity of remanding for further evidence.
Several witnesses testified with regard to the nature of the contract. One of the more important was Donald J. Bain, Continental Grain Company's vice president in charge of compliance. Bain, admitted to the bar of the State of New York, worked as an assistant general counsel for Continental on several drafts of the proposed contract prior to its confection. His duties in connection with the contract were to assist in its negotiation and drafting.
According to Bain's testimony: The earliest document pertaining to the proposed contract which could be found was dated November 23, 1969. The Westwego contract basically was desired by plaintiff, and it was negotiated together with a similar document wanted by defendant Continental for use on the St. Lawrence River. The contract was set up as a "through-put" agreement without "identity preserve" to avoid expense, especially demurrage, and to allow Continental to sell off barges before they reached the Westwego elevator in order to control the flow of grain to coincide with boat arrivals and other Continental commitments. The original proposals offered by both parties concentrated on a C.I.F.-F.O.B. "through-put" contract, with plaintiff's proposal having more detail. He pointed out a document dated June 18, 1970 contained a proposal for a minimum commitment of 18 million bushels per year because in reality the contract was one for the use of defendant's elevator. He also produced a letter of July 22, 1970 which contained a clause to the effect that plaintiff should not be deemed in default of its delivery requirements when shipments were delayed for reasons beyond its control. This, together with a proposed clause that defendant should have no obligation to advance grain for the account of plaintiff, were replaced by the force majeure clause invoked by defendant in this case.
Bain's testimony on cross examination was more revealing than that on direct. He was confronted with the other agreement negotiated simultaneously with the Westwego contract, which the parties referred to as the Port Cartier agreement. The Port Cartier agreement defined itself expressly as a "through-put" agreement, and when questioned why the same verbiage was not used in the Westwego agreement Bain explained that the term was expressly used in the Port Cartier agreement because it covered two distinct situations, one in which grain from the Canadian Wheat Board was handled, with title changing on loading, and the other involving United States origin *448 grain on vessels "tendered" by defendant. He insisted, however, that the same concept was embodied in the Westwego agreement by the sequence of timing of each event. The contract first calls for a sale to defendant by plaintiff, then for a purchase and sale by defendant, and finally by a purchase by plaintiff from defendant's grain elevator. This, in effect, is the factual concept of a "through-put" agreement, and we tend to agree.
Other significant testimony with regard to the nature of the contract was offered by Kurt Horn, a former employee who had retired after working forty years with defendant. He testified he was in charge of logistics for the East Gulf region, and in the summer of 1970 he met with representatives of plaintiff to arrange for a "through-put" agreement. He was quite emphatic with regard to the nature of the agreement and insisted it was a "through-put" and not a series of separate and independent sales. The parties early discarded the identity preserve concept because it was impractical to both and decided on the use of the purchase and sale concept in order to save demurrage and record-keeping expenses. Horn further testified he was involved in the day-to-day administration of the contract, and shed light on its contemporaneous interpretation by the actions of the parties. He stated that in December of 1972, when the Mississippi River had become frozen and closed to traffic, plaintiff had three barges icebound, which could not be delivered to New Orleans in time for export loading. After consultations with defendant's representatives, plaintiff agreed to take the barges back even though technically it had sold them to defendant. He further related that in June of 1973 a federal grain embargo threatened to prevent export of any grain out of the Port of New Orleans. Plaintiff then agreed to stop shipping barges of soybeans if the federal embargo in fact prevented ships from leaving port.
Throughout his testimony, Horn emphasized the agreement was carried out in a pragmatic way, and problems were solved on a case-by-case basis. Typical of his testimony is the statement that each of the parties would help the other if it did not result in harm to themselves.
On cross examination Horn stood firm with regard to the advantages of the purchase and sale procedure over any other form of "through-put" agreement. He used the graphic example of loading a thirty thousand ton ship without the use of purchase and sale contracts. In such a situation, grain shipments would arrive at the elevator in barges and often also in cars. Thus, the elevator would have to keep track of approximately thirty barges, maintain stock records, be obliged to ascertain the origin and composition of the grain being shipped, be obliged to know what type of grain was needed and the correct time to schedule unloading for proper binning and ship scheduling. This, he testified, is simplified into a workable form by using the purchase and sale contracts as vehicles for record keeping.
Horn reaffirmed the position of defendant that the sale to it from plaintiff had as its primary objective the control of the flow of grain into the elevator by moving or selling excess grain elsewhere. Moreover, because cleaning and demurrage were performed by defendant under the contract, it had to be able to move the grain from the elevator to keep demurrage charges under control. He further testified that while technically title to the grain may have been in defendant, the grain was treated as plaintiff's grain, and it was anticipated that plaintiff would ship grain as a precedent to its being loaded by defendant at the Westwego elevator.
Other employees of defendant testified, and their testimony basically conforms with that of Bain and Horn.
On the contrary, plaintiff offered the testimony of John Finlayson, one of its chief executives whose function was, in part, to deal with the Westwego contract. Finlayson defined "through-put" agreement as a contract between a grain elevator and a shipper for use of the elevator to load the shipper's grain, with the shipper keeping title and risk of loss before the grain entered *449 the elevator, while it was in the elevator, and after it was aboard ship. He admitted that identity preserve is not needed for a "through-put" agreement, but nevertheless insisted the Westwego agreement was not such an agreement.
Finlayson's testimony was weakened by several things. He admitted liability for payment of insurance premiums on the grain while in the elevator was for negotiation as part of each individual contract. He also did not know who paid for screening of grain in what he called a "through-put" agreement. He admitted the shipper "might" pay for drying and cleaning, but implied this also was negotiable. He did not know, under his form of "through-put" agreement, who is obliged to make claim for damage to cargo, and only stated that "normally" the shipper retains title to the grain. He also stated that "normally" the shipper is obliged to have someone check the cargo as it comes out of the rail car or barge if the contract is "other than" for one month or "a couple of cargos." By stating these things "normally" occur in the manner he related, he implied rather strongly that these items are not written in stone and are subject to negotiation in all "through-put" agreements. Likewise, he admitted the cost of shrinkage of grain in the elevator between the weight put in and the weight outloaded was negotiable. Consequently, by admitting so many of the items normally provided for in a "through-put" agreement are subject to negotiation and different treatment in each "through-put", his original unequivocal testimony regarding the nature of "through-put" agreements and his insistence that the Westwego contract was not a "through-put" agreement were substantially weakened.
Finally, Finlayson's testimony is further weakened by his telex dated July 22, 1976, addressed to M. Laserson, senior vice president of defendant's grain division in New York. The telex reads as follows:
"This will confirm our telephone conversation of yesterday. We have mutually agreed that since Westwego elevator will be closed for renovations during the month of September, Dreyfus maximum thruput for the succeeding six (6) months will be increased a total of 2,500,000. The new maximum for the six months of October/November/December 1976 and January/February/March 1977 therefore now becomes 2,916,666 bushels." (Emphasis ours).
Plaintiff attempts to show defendant's actions in selling off icebound barges before they reached the Port of New Orleans was a major or contributing factor in its alleged breach of contract. Plaintiff offered testimony which indicated fifteen of the twenty or twenty-one[8] barges sold by plaintiff were in turn sold by defendant in transit prior to their reaching New Orleans. Such evidence might be subject to considerable weight but for the condition of the river at the time the barges were sold to defendant and in turn resold by defendant to third persons. Plaintiff's proof falls short of establishing that defendant thus caused or contributed to its alleged breach of contract because it did not prove the barges in question could have reached the Westwego elevator in time for February loading. When defendant sold the grain-loaded barges to third persons, they were icebound and the time of their reaching the Port of New Orleans was, at best, problematical. Defendant had the right to sell these barges, and it apparently did so in an attempt to minimize losses under the circumstances.
Considering all of the evidence in the record, we conclude the Westwego contract between plaintiff and defendant dated April 1, 1971 was a "through-put" agreement which provided primarily for the use of defendant's grain elevator by plaintiff in the transshipment of grain for export. While title to the grain changed to defendant as it made its way down the Mississippi River, defendant was obliged to resell the *450 identical quantity and quality of grain (within practical limits) to plaintiff at the identical price plus a charge for use of the defendant's grain elevator facilities. Defendant did not have the option of raising the price to plaintiff on its F.O.B. sales for loading aboard ship. And the contract provided for payment of 1% interest over prime on defendant's money used between the time of purchase by defendant and the time of repurchase by plaintiff at the F.O.B. loading for the "corresponding" grain. Grain being a fungible commodity, it made no difference whether the identical grain was loaded aboard ship, so long as the same quantity and grade was tendered by the elevator for export. If the elevator owner maintained its obligation to supply the proper amount and grade of grain at the end of the shipping route, the mere transfer of title to the grain elevator while the goods were being shipped down the Mississippi River did not change the essence of the contract from a "through-put" to a series of independent purchases and sales.
We also conclude the contract in suit was administered as a "through-put" agreement until so treating it became economically unfeasible to plaintiff. Consequently, the defendant had a right to rely on the prior shipment of grain in sufficient quantities to be sure it could meet its commitments at its end of the shipping lane, and we hold defendant did not violate the contract by invoking the force majeure clause in the face of an ice-choked river which prevented the movement of grain north of St. Louis. We therefore further conclude defendant did not breach its contract and that it is not responsible to plaintiff for damages as a result of not loading plaintiff's February F.O.B. purchase.
The parties also take issue with the court's finding that plaintiff owed defendant $82,634 for interest under the Westwego contract. As the contractual provisions quoted above establish the duty of plaintiff to pay defendant interest at the rate of 1% over prime established at the First City Bank in New York, the contract is clear on this point. The trial judge found as a matter of fact the amount owed by plaintiff for interest on corn purchases was $32,036 and on soybean purchases was $50,598, resulting in the total of $82,634.
These figures come from the fact that during January 1 through 25, 1977 defendant purchased from plaintiff 1.9 million bushels of corn and paid Dreyfus therefor the sum of $4,600,400 during the period January 7 through February 9, 1977. The period during which interest accrued under the corn contract ended when Continental sold to Dreyfus the corresponding amount of corn loaded aboard the M/V Jasaka and the M/V Mezada, which purchases were paid on February 17 and March 3, 1977. The facts further are that defendant purchased one million bushels of soybeans from plaintiff between January 12 and March 18, 1977, and defendant claims interest until the beans were loaded aboard the M/V Thorsdrake and paid for by Dreyfus on March 3, 1977.
We do not find error in the trial court's award of interest. The contract is express and clear on the payment of interest from the date of purchase by defendant until the date of repurchase by plaintiff.
Plaintiff contends the trial court erred in awarding the entire amount of interest claimed because by so doing, it allowed defendant to take advantage of its own breach of contract and that the interest period would have been shorter had defendant not refused to load vessels tendered by plaintiff for shipment of corn and soybeans. As we have found defendant did not breach its contract, the argument that it cannot take advantage of a breach which did not exist is without merit.
The final problem for our consideration is the amount, if any, owed plaintiff by defendant for overpayment of elevation charges. With regard to this dispute the pertinent part of the contract is Section 8.2, which reads as follows:

"8.2 Changes in Tariff Rates

a. Dreyfus recognizes Continental's rights from time to time to amend the Tariff.

*451 b. In the event that the total of the charges stated in Item No. 1 and Item No. 2A of the Tariff (presently at 2 [cents] and 1 [cent] per bushel, respectively) for in and out elevations, are increased as permitted under Subsection a above and such new charges are at the time in question no higher than the charges of other export, public grain elevators at East Gulf Coast Ports, the additional charge specified in Subsection 3.2a(1), as increased or decreased from time to time in accordance with this Subsection b and Subsection c below, shall be increased by a like amount.
c. In the event that the charges stated in Item No. 1 and Item No. 2A of the Tariff (presently at 2 [cents] and 1 [cent] per bushel, respectively) for in and out elevations, are decreased as permitted under Subsection a, or Continental makes an agreement hereafter during the term of this Agreement with another person (other than agencies of the U.S. government) providing for elevation charges lower than the additional charge specified in Subsection 3.2a(1), as increased or decreased from time to time in accordance with this Subsection c and Subsection b above, such additional charge as increased or decreased from time to time shall be decreased by a like amount or be reduced to such lower charges provided for in such agreement, as the case may be."
Defendant originally charged 2¼ cents per bushel for elevation of shipments through its elevator, which charge was added to the price of each bushel in accordance with the express terms of the contract. On April 1, 1975, defendant raised the rate to 4¼ cents per bushel; on June 1, 1976, the rate was raised to 5 cents; and on April 1, 1977, the rate was raised to 7 cents.
When defendant changed the rate from 5 cents to 7 cents, plaintiff objected on the basis that defendant was not entitled to such a high rate. In lieu of litigating the matter at that time, both parties agreed without prejudice that plaintiff would pay 6 cents per bushel until the court could decide what rate was correct.
The parties stipulated that if defendant is correct in its position, it is entitled to recover $215,493.05, being the difference between the 6 cent and 7 cent charges made on 21,549,305 bushels of grain handled through the Westwego elevator for plaintiff from April 1, 1977 through December 22, 1977, when defendant's elevator was destroyed by an explosion and fire.
There is no dispute concerning the fact that defendant raised its rate as stated above. It is also clear Continental amended its tariff to provide for a 7 cent rate per bushel. Moreover, the evidence establishes that grain elevators at Terre Haute, in St. James Parish, and at Port Allen, Louisiana (both owned by Cargill Grain Company) has been charging 8 cents elevation fees since July of 1976.
The dispute between the parties results from the language of the section quoted above which authorizes an increase if "... such new charges are at the time in question no higher than the charges of other export, public grain elevators at East Gulf Coast Ports, ..." Defendant takes the position that so long as its tariff rate is below any of such grain elevators, it is within the meaning of the contract. On the contrary, plaintiff contends the language of the contract means that the charge which defendant may make must be based on the average of the various public grain elevators located in the East Gulf Coast.
The situation is further complicated by the trial court's finding that there are no "public grain elevators at East Gulf Coast Ports." In accordance with this finding, the court ruled the elevation charges should remain at 6 cents in accordance with the agreement of the parties to pay and accept that amount unless the court decided the cost should be 5 cents or 7 cents.
The parties offered evidence to show that public grain elevators do exist in East Gulf Coast Ports. Defendant established the rate at the two Cargill elevators mentioned above, each charging 8 cents elevation; plaintiff established the public grain elevator of New Orleans, Inc. charged 5 cents *452 elevation, and the Alabama State Docks Department, Public Grain Elevator, charged 3¼ cents.
The argument and evidence on behalf of each side of the case presents problems. The Public Grain Elevator of New Orleans, Inc. is no longer a "public" elevator; it is now privately operated by Fox, Peavy & Pike, Inc. The Alabama State Docks Department Grain Elevator, while being run for the benefit of the general Mobile, Alabama area, is not particularly comparable to the other elevators since it primarily handles rail shipments and operates in a manner inconsistent with the other grain elevators in the East Gulf Coast region. Hence, its rates and methods of charging for loading are hardly suitable for comparison purposes in this case.
On the other hand, defendant takes the position that the word "public" should be afforded a liberal construction. It argues that any elevator which files a tariff with the Federal Maritime Commission and is licensed by the Department of Agriculture is a public grain elevator. The filing of a tariff implies that a facility is available for public use, and defendant argues that once this requirement is met, the fact that the owner or operator of the elevator makes use of its full capacity and has very little, if any, demand from the public for its use is not a determining factor. In short, defendant contends its elevator, together with the two Cargill elevators mentioned above, all file tariffs with the Federal Maritime Commission and operate under the warehouse section of the United States Department of Agriculture under the Federal Warehouse Act, and therefore come under the definition of a "public grain elevator".
However, Mr. Bain, the defendant's vice president in charge of compliance and an attorney admitted to practice in the state of New York, testified under cross examination that the elevators mentioned were public elevators at the time of the drafting of the contract in suit because they operated by having exporters pay the rates nominated in the tariffs to put their grain through the elevators without the necessity of title to the grain changing. He added, however, that during the past decade nearly all East Gulf Coast grain elevators, with the exception of the one at Mobile, operate under the purchase and sale concept spelled out in the present contract. Perhaps for this reason defendant concedes candidly that the trial judge's finding that there are no public grain elevators in the East Gulf Coast area "... is completely justified from a de facto point of view in the context of this case."
Given the conflicting factual evidence presented to the trial judge, the vague wording of the applicable contract provision, and the testimony indicating the Mobile Public Grain Elevator is not comparable to others in the East Gulf Coast area because of the different purpose and manner of its operation, we cannot overrule the trial judge's finding of fact that there are no "public" grain elevators in the East Gulf Coast area. Based on this finding, the trial judge was correct in allowing the 6 cents per bushel rate to stand for the period between April 1, 1977 and December 22, 1977 when the defendant grain elevator was destroyed. Had they desired any other result, the parties easily could have achieved the same by specifically defining what a "public grain elevator" was intended to be in the contract.
For the reasons assigned, the judgment appealed from is affirmed in part, reversed in part, and recast so as to read as follows:
"IT IS ORDERED, ADJUDGED AND DECREED that there be judgment on the main demand in favor of the defendant, Continental Grain Company, and against the plaintiff, Louis Dreyfus Corporation, dismissing said plaintiff's demand.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment on the reconventional demand in favor of the plaintiff in reconvention, Continental Grain Company, and against the defendant in reconvention, Louis Dreyfus Corporation, in the full sum of $82,634, together with legal interest thereon from judicial demand until paid."
It is further ordered that all costs in both courts are to be paid by the original plaintiff, Louis Dreyfus Corporation.
*453 AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] Louis Dreyfus Corp. v. Continental Grain Co., La.App., 348 So.2d 1286.
[2] While the answer to the appeal is somewhat ambiguous, we construe it to mean defendant requests an award for elevation charges, to be explained below.
[3] The record indicates the period may have been from January 14, 1977 to February 14, 1977, but we do not find this three-day difference to be germane.
[4] With regard to the barge shipments, the term "C.I.F." denotes cargo, insurance, and freight were paid by the seller, Dreyfus. Any rail shipments to Westwego were also paid for by Dreyfus.
[5] The contract also provided for plaintiff to pay for inbound and outbound inspection and weighing in accordance with rates set by the New Orleans Board of Trade. Moreover, differences (either upward or downward) between quantities and grades of grain loaded aboard plaintiff's designated vessels were settled by cash reimbursements between the parties.
[6] "Spot" sales represent sales of commodities with delivery available within 2 to 5 days.
[7] These figures were given for February 18, 1977 and varied somewhat from day to day.
[8] The record is unclear as to whether plaintiff tendered and sold twenty or twenty-one barges to defendant.